1019 INO Therapeutics v. Praxair. Mr. Waxman, good morning. Good morning. May it please the court. Mallinckrodt's method of treatment claims are directed to a new and improved protocol for treating gravely ill neonates. Well, let me just be clear. I understand. I'm sorry to interrupt. The method of treatment is no treatment. No, the method of treatment is an integrated step, is a series of integrated diagnostic and treatment steps in which a neonates with hypoxic respiratory failure are given a specific diagnostic test to determine whether they have pre-existing left ventricular dysfunction. And depending on the outcome of that diagnostic test, are given one of two specifically specified treatment protocols. One is the administration of, in addition to other things that are done for these gravely ill children, to give them 20 parts per million of inhaled nitric oxide. And that was in the prior arc, right? was that neonates with hypoxic respiratory failure that have pre-existing left ventricle disorder are gravely at risk for pulmonary edema if they are administered this as part of their regimen. Suppose the claims here had said, consider whether to treat these children with LVD. Yes, Your Honor. Would that have been patent eligible? No, that would have been non-patent eligible under Mayo, because as Justice Breyer explained for the court in Mayo, diagnostic claims that merely, quote, inform the audience about certain laws of nature while, quote, trusting the audience to use those laws appropriately are directed to the law of nature. But, the opinion goes on to say, a patent claiming a treatment method, quote, such as a new way of using an existing drug, remains patentable. So do you agree that it has to be a new way of using a drug? Well, the, a new way of using a drug, which I think would include the Does have to be a new way. Well, it has to be a new and, it has to achieve a new and useful end under the section, not only under 102 and 103, but under the case law that is built up under Mayo and Myriad and Alice. That is, it has to, in other words, the difference between Your Honor's hypothetical and this one is the fundamental difference that this court has repeatedly recognized between a patent claim that recites a discovery and trusts the relevant person of ordinary skill in the yard to use the knowledge, the information conveyed in the claim in the best appropriate way, and patent claims that go further and that apply the discovery for a new and useful end. And the difference So does that mean then that in Mayo itself, if the claims instead of saying consider altering the treatment, said instead alter the treatment to give more or less depending on the blood levels, that that would then have been patent eligible? I think that would have been patent eligible. This is a stronger case because this involves an affirmative proactive step that is the testing for pre-existing LVD that didn't exist in Mayo where everybody was being treated with thiopurine. But I do think that the import of Justice Breyer's opinion in Mayo, in which he makes clear that he is not addressing the latter situation. That wouldn't leave much of Mayo, would it? And wouldn't it be quite different? The Mayo structure would be quite different from the Alice structure under those circumstances. I don't really think so because the first test in Mayo is – I mean I think for two reasons. I hope I don't forget the second one. Well, the first reason is there's a huge difference in preemptive scope. The main concern that Mayo was concerned about is patenting the discovery, patenting the observation preempts anybody from coming up with further treatments. Other, for example, other metabolite levels to take the actual example in Mayo. In this case, if all that was being patented was the observation of the law that do these steps to observe whether the neonate with hypoxic respiratory failure has pre-existing LVD. Any scientist, any physician who did that in an attempt to come up with a different or more efficacious treatment regimen would be infringing the patent. Whereas here and in all claims that add specific treatment steps, there is nothing whatsoever that prevents the scientific community with coming up with other ways of helping neonates with hypoxic respiratory failure and LVD. But just so I understand it, you're not contending that you invented a new way of detecting LVD? No. That is, the patent itself recites that there were pre-existing ways, including echocardiography, to determine whether somebody has left ventricle dysfunction. What the patent claims that is novel is the importance, indeed necessity, of conducting this proactive test before administering INO, which was not in the prior art. It was, if you have a neonate, if the neonate has hypoxic respiratory failure, administer this. And this is, what was novel here, is a form of, Judge Dyke, what you were describing in a 103 context in Prometheus Labs versus Roxanne. And that is, quote, singling out a particular subset of patients for treatment may reflect a new and useful invention that is patent eligible, despite the existence of prior art or prior art patent disclosing the treatment method to patients generally. But let me just speak. Go ahead. Well, just to pursue this thought, are you suggesting that the line is drawn depending on whether that particular, that specificity is in the claim rather than in the disclosure? That it's insufficient if it's in the specification in general, but that if it's moved into the claim, we then cross the barrier, solve the Section 101 problem, and move only into 103? So, I believe the… I'm trying to understand. There are lines to be drawn. Our position is this, and I think this is embedded in the Supreme Court's cases going at least back to Funk Brothers, that is, there is a fundamental difference for 101 purposes between a claim that recites a new discovery and leaves it to the discretion of practitioners how to apply that discovery and a claim that applies that new discovery for a specific new and useful end. For example… I think it's hard to read Mayo that way because Mayo itself and Myriad and Alice later on made clear that merely telling someone to apply the discovery, it doesn't make it patent eligible. And in a way, that seems as though that's what this situation is. Well, I think you've identified the crux of the issue. It was the crux of the dispute between the majority and the dissent in the recent Vanda decision. I think that my understanding of Mayo, and frankly I think this circuit's understanding of Mayo now, is that there is a difference between doing the, here is a new discovery, go ahead and apply it, which Justice Breyer explained is like Einstein telling the operators of a nuclear acceleration lab, here is my theory of special relativity. Keep that in mind when you conduct your functions. As opposed to, here is the theory of special relativity. Do the following, X, Y, and Z. The scope of preemption between those two things is vastly different, and the nature of the claim, that is what this court has said over and over again, looking at Mayo is, in all of its diagnostic cases, says look, the beginning and the end of the process here is the same. It's information. It's the, as your Honor said in the genetic technologies versus myriad case, quote, the product of the method of the claim is information, close quote. It was not a new and useful way of applying the information. Similarly, in the BRCA case in this court, the court said, quote, the claim recites nothing more than the abstract mental steps necessary to compare two different nucleotide sequences. There was no element of the claim. There was no aspect of the invention that said, now go ahead and apply this in this new and useful way. And that, I understand, is the distinction in the law, and I think it's the distinction that has to be drawn. So but the problem then is what's left of Mayo if the claims would have been patent eligible if they had said take this into account and increase or decrease the dosage depending on the natural law. And if it had done nothing more than that, your view is that it would have made it patent eligible. Well, I – and I think your Honor keeps phrasing it as what would be left of Mayo. There would be nothing more. The point that the Supreme Court was making in Mayo was – It would just depend on how you drafted the claims. You can get around Mayo by drafting the claims the right way, and yet Mayo charges us not to let it turn on the draftsman's art. Well, it is true that you can't let something turn on the draftsman's art and a treatment step at a sufficient level of generality. You could say that Mayo was – this court has said that Mayo is a – involved a diagnostic claim, but you could also say it involved a treatment, a method of treatment in which the specified method was articulated at such a high level of generality that it is not patent eligible. But I think if one thinks about the concern, the reason for the judge-made doctrine limiting the broad scope of 101 is a concern about preemption, about preempting further discovery. And the difference between a claim that says here is an observed law of nature that may have consequences in the real world, apply it accordingly, is categorically different than a claim that says here is a new law of nature. And with that new law of nature, you need to do the following integrated things. You need to find this population. You need to test this population in this way, and then you need to selectively administer a treatment protocol. The consequence of – That seems to be hard to say that that would be patent eligible. The only difference – and let me answer this question and aspire to save some time for rebuttal. The only difference with respect between the claimant issue in this case and the claim that was held patent eligible subject matter in Vanda is that in Vanda, the differential treatment involved with respect to a particular select subsection of the population, the administration of a lower dose depending on the observance. Which was found to be novel and not conventional. And – To be itself a discovery. So two points here. There is nothing conventional, utterly nothing conventional about withholding one of the few life-saving therapies from a neonate with hypoxic respiratory failure. More conventional would be what was claimed and held patentable in Vanda, which is give them a lower dose. The point here is that the difference between something that says if you do this test and you – and if you find a particular result, you administer between 12 milligrams and below. Or if you find this, you do something more dramatic and don't administer at all. Suggests that if the claim in this case had said if you find preexisting LVD, administer a dosage of INO of .0001%. That can't be the law. I see I have 30 seconds. Your time is running out, but why don't you spend a couple minutes talking about the other issue in this case with the DISR patent? Sure. I mean, I think in large part we're happy to rely on the briefing in this case. But on infringement, our fundamental position is that the court interpreted the DISR claims in a way that contradicts their plain meaning and the specification. And importantly, wouldn't even read on our own commercial embodiment. The claim refers to, quote, a memory to store gas, close quote. And then it recites other components, quote, in communication with the memory that receives signals and, quote, verifies one or more of gas identification, gas concentration, and that the gas has not expired. The claim language, and this relates to the construction of verification, the claim language is about verifying the gas that is stored in the memory. It does not require, and indeed to my knowledge and my client's knowledge, there is no actual way of verifying in real time the gas that is actually in the cylinder.  Thank you. I'm going to go restore some of the double time. Good morning. May it please the court. Your Honor, these patents do not claim a new method of using. Can you speak up a little? I'm sorry, Your Honor. These patents do not claim a new method of using an existing drug. They simply claim not treating a subset of patients with that drug. Well, why isn't that a legitimate discovery if you conclude that these patients should not be taking the drug? Is that any different than if you conclude these patients react badly so we should give them a smaller dosage than we give other people? Yes, Your Honor. The distinction is absolutely critical. And let me start with the Mayo framework, which is Mayo holds that to transform an unpatentable law of nature into a patent eligible application, a patent must do more than simply state the law of nature while adding the words apply it. I don't believe that Mayo can be read to hold that applications of laws of nature in treatment are eligible for patent protection unless they are accompanied by an inventive concept that transforms that law of nature. I guess maybe the difference between the two situations is that in one, the treatment decision, that is not to treat flows necessarily from the law of nature, whereas in the second situation, the particular dosage doesn't perhaps necessarily flow from the law of nature. Yes, Your Honor. And Chief Judge Prost, that was the answer I was about to give to your question. I was not trying to avoid it. We don't believe that instruction not to treat patients would be an inventive concept that transforms that law of nature. The contrast here with the claims in Vanda is truly striking, like the patentee in this case. But I guess the problem is that the particular dosage might also be set to, in your hypothetical, might also be said to flow from the law of nature. The law of nature shows you that one dose is OK and another dose is not OK. So is that really a distinction from the treat, don't treat situation? Yes, Your Honor, I believe it is because there are two different ways that a law of nature can operate. There's obviously all patents, as the Supreme Court has recognized, depend on the operation of laws of nature. Mechanical devices depend on physical forces such as friction. Any type of method of treatment relies on a fundamental level of the physical reaction of the body to certain doses. But this law of nature here that these claims are directed to isn't this mechanical law of nature that's used to accomplish a result. The law of nature is the observation of a risk, the purportedly novel recognition of the link between left ventricular dysfunction and pulmonary edema. Now, the patentees in Vanda identified a similar risk. They identified a risk condition for cardiac problems for patients who were poor metabolizers. But what they did in Vanda is not stop there. What they went on to do was develop a specific treatment for those poor metabolizers based on the risk. As the court said, the claims in Vanda were directed to a specific method of treatment for specific patients using a specific compound at specific doses to achieve a specific outcome. And when you look at what the inventor in Vanda believed that they invented, I'd urge you to look at the Vanda-Apollese brief where they discuss what the inventive concept was. And what they said is very consistent with what I'm saying today. They said, yes, they recognized the risk, but the inventive concept was determining the resultant dosages that could safely and efficaciously treat these poor metabolizers and in claiming the specific administration of those dosages. It was the specific method of treatment that the claims in Vanda were directed to. And that specific method of treatment was the inventive concept that those inventors added to the natural law of the risk that they recognized. And Chief Judge Prost will also say the difference between treatment and non-treatment is also critical for the preemptive effect of these claims. My friend suggested that these claims would not hinder the development of additional treatments. But imagine that a company like Brexair took the risk that Mallinckrodt identified, the link between LVD and pulmonary edema, and decided to go and invest money and invent a new treatment for these patients. A treatment with a brand new drug, perhaps treatment with pure oxygen, perhaps treatment with Tylenol, a completely new treatment that doesn't rely on inhaled nitric oxide. That new treatment would practice the claims here because those patients are being excluded from treatment with inhaled nitric oxide. And the claim says exclude them from treatment with inhaled nitric oxide. What it's truly covering is any treatment other than nitric oxide. I think we might fix that problem by interpreting the claim so it wouldn't cover the new concept. Perhaps you're right. Although, I think it's unusual to claim inaction, to claim not doing a particular step rather than doing a particular step. With respect to the relationship of the excluding step and the natural law, I think it's worth looking at the district court's finding here. That excluding these patients is no different than stating the law of nature and having the words apply it. You see that on appendix page 27. And I think you have to recognize that in light of the record that was in front of Judge Slate. Now, as you'll recall, this is an ANDA case, an abbreviated new drug application. Malincroft's theory of infringement at the trial court was, as it had to be, that by selling a generic version of inhaled nitric oxide, Praxair was inducing doctors to practice these method claims, including the excluding step. But when you look at the label that would be sold with Praxair's version of inhaled nitric oxide, notably you don't see the instruction to exclude. What you see there is the label informing doctors about the link between left ventricular dysfunction and pulmonary edema. Malincroft's arguments to the district court was that by telling doctors about that link, doctors would necessarily begin excluding these patients from treatment. Their expert, Dr. Rosenthal, testified that this exclusion was implicit in telling doctors about the natural law. Similarly, in trying to establish that this link between LVD and pulmonary edema was non-obvious, their expert, one of their witnesses, sorry, Dr. Wessel, who was involved in the INAH 22 study, said, well, of course we didn't know about this link between LVD and pulmonary edema. If we had known about this link, we would have been negligently or intentionally harming children, not to exclude them. Malincroft's case at trial involved arguments that doctors that knew about the link between LVD and pulmonary edema would exclude these patients. The district court, I don't think, erred in finding that excluding these neonates from treatment was nothing more than telling doctors to apply this natural law in the course of their treatment. And there's certainly no suggestion here there was anything inventive about it. I'd actually encourage you to look at the inventor's testimony about the source of the exclusion step. You'll see this on appendix pages 1497 to 1499. There's a fairly long discussion of recognizing the link between left ventricular dysfunction and pulmonary edema and other serious adverse events. But what you won't see is any sort of analysis, any sort of invention that goes into, we have recognized this link, what should we do next? The inventor simply says, well, we recognize this risk, so of course we exclude them. One is left with the sense, what else could we do? Unless the panel has further questions about the 101 issues. No, but before you move on, if you're going to move on to the infringement question, can I just ask you a housekeeping question, which is the breadth of the district court's judgment here to cover all of the patents as opposed to identifying the claims that were actually asserted in dispute. Are we all in agreement that that was overbroad or inadvertent? It may have been, certainly it was inadvertent, but that that's a problem? Your Honor, we'll certainly leave to the panel's discretion whether to render a judgment limited to the asserted claims. Well, the only basis for sustaining the judgment would be that there's a res judicata effect on these other claims, which would seem to be an issue for a later case and not for this case. Certainly, Your Honor. Chief Judge Prost, I cannot seriously dispute that.  With respect to the device claims, I don't actually believe there's any need to address my friend's verification arguments. With respect to the cylinders, the district court held that the cylinders that we sold were not reasonably capable of infringing the claims at the time of sale. That was not challenged on appeal. That is an independent basis not tied into the verification construction on which there could be no direct infringement. And as the district court noted, with no direct infringement, there can be no indirect infringement. And then similarly, with respect to the Knoxbox Eye device, the district court not only found that the device did not satisfy the verify limitation, the district court also concluded that there was no communication of the gas data. You see that on appendix page 41, and I don't believe that's been attacked on appeal either. With respect to whether there was a verification, we don't see this as a claim construction issue. My friend didn't press a construction verify below. The question was whether the district court in a bench trial can conclude that there was no verification under the plain and ordinary meaning of verification. Here, the alleged verification involved two values that had the same source being stored in separate places in memory in the Knoxbox Eye, and those two values being compared against each other. I think the district court, as a fact finder, didn't clearly err in concluding that there was no verification when a value was simply compared to itself. Unless the panel has further questions, I'll happily yield. I just have three points. One goes directly, I think, to Judge Teich's question to me and first question to my friend, which I think, which I understand, embeds the observation that, well, perhaps withholding this drug simply flows from the natural law itself. I want to explain why I think that's not a fair means for distinguishing between patentable and not patentable claims, and in any event is not an accurate characterization of what, in fact, was necessarily discovered. First of all, if you discover something that helps, you discover that aspirin helps headaches or chemotherapy helps cancer, the most natural thing to do is to apply it. But we don't deny patent eligibility on the grounds that the discovery of something new, if applied, is the most natural thing to do in light of the discovery. Second of all, withholding INO, which is one of the few means of treating these gravely ill neonates, is not the most obvious thing to do. Among the many other ways you could, assuming the science clears this out, and contrary to my friend's representation, there would be nothing preemptive in this claim from Praxair figuring out and demonstrating that you can just give a lower dosage. You can separate out the dosing times. You can administer the regular dose along with another product, another therapeutic agent that mitigates the risk of LVD. All of those other things may turn out to be an efficacious way to balance somebody. It is not the most obvious thing for a physician in the NICU who concludes, if I don't give INO, this baby will die as a certainty in my medical judgment. And so this is simply not a case in which withholding flows from the natural law itself. And finally, with respect to my friend's observations about what would or would not amount to infringement of this claim, the district judge didn't address infringement, either direct or contributory, or induced infringement with respect to this claim. And presumably if this court reverses the determination of under 101, we will have an adjudication about whether or not, at this end of step, there is in fact an infringement. We think there is, but it's not before this court. Thank you. We thank both sides and the case is submitted. The next case for argument is 18-1172, Sony Corporation v. Yonkuk.